**Affirmed in part; Reversed in part; and Dismissed and Opinion Filed July 27, 2017**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00319-CV

**NORTHERN FRAC PROPPANTS, II, LLC, LAMSTEX MATERIAL HANDLING, LLC, AND JEFFRIES ALSTON, Appellants**
**V.**
**2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellees**


**BADGER MINING CORPORATION, Appellant**
**V.**
**2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellees**


**2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellants**
**V.**
**J & P CAPITAL, LLC AND PATRICK A. TESSON, Appellees**

**On Appeal from the 162nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-15-01754**

## MEMORANDUM OPINION

Before Justices Lang, Brown, and Whitehill
Opinion by Justice Whitehill

This is an interlocutory appeal from orders granting and denying special appearances.

Plaintiffs 2011 NF Holdings, LLC f/k/a NF Holdings, LLC, and Northern Frac Proppants, LLC, and its series subsidiaries sued six defendants on a variety of commercial torts. All defendants filed special appearances challenging personal jurisdiction. The trial court granted two defendants' special appearances and denied the others. The four defendants who lost their special appearances appealed, and plaintiffs appealed as to the two defendants whose special appearances were granted. We thus address six special appearances, all tied to the same series of transactions.

Although we address both general and specific personal jurisdiction over each defendant, this appeal presents this central specific jurisdiction question: Do non-Texas residents who acquire and sell Wisconsin sand mines and related rights purposefully avail themselves of Texas if (i) Texas companies claim to be the assets' rightful owners and (ii) the non-residents know that much of the sand produced in Wisconsin will be sold to customers for use in Texas fracing[1] operations? We conclude that the answer is no based on this case's particular facts.

Because Texas cannot constitutionally exercise either specific or general personal jurisdiction over any defendant, we affirm in part, reverse in part, and render judgment dismissing the case for lack of personal jurisdiction.

## I. BACKGROUND

Because plaintiffs are both appellants and appellees in this appeal, we will generally refer to the parties as "plaintiffs" and "defendants" instead of appellants and appellees.

### A. The Parties

#### 1. The Plaintiffs

The plaintiffs are:

_____

[1] This term is sometimes spelled "fracking." *See, e.g.*, *In re Lipsky*, 460 S.W.3d 479, 585 (Tex. 2015) (orig. proceeding).

2011 NF Holdings, LLC f/k/a NF Holdings, LLC (NF Holdings) is a Delaware limited liability company with its principal office in Richardson, Texas.

Northern Frac Proppants, LLC (NFP I) is a Delaware series limited liability company.[2] Plaintiffs allege that NFP I's principal office is in Richardson, Texas, but NFP I's limited liability company agreement reflects that its principal place of business is in Alexandria, Minnesota.

Northern Frac Proppants Series-1, LLC (NFP Series-1) is a limited liability company with its principal office in Richardson, Texas. NFP Series-1 is an NFP I series subsidiary.

Northern Frac Proppants Series-2, LLC (NFP Series-2) is a limited liability company with its principal office in Richardson, Texas. NFP Series-2 is an NFP I series subsidiary.

Plaintiffs are (i) appellees regarding Northern Frac Proppants, II, LLC's, Lamstex Material Handling, LLC's, Jeffries Alston's, and Badger Mining Corporation's appeals from the trial court's orders denying their special appearances and (ii) appellants regarding the trial court's orders granting J&P Capital, LLC's and Patrick A. Tesson's special appearances.

## 2.     The Defendants

The defendants are:

Northern Frac Proppants II, LLC (NFP II), a Delaware limited liability company. Plaintiffs allege that NFP II's principal place of business is in Houston, Texas.

Jeffries Alston, a Louisiana resident.

Lamstex Material Handling, LLC, which claims to be a Louisiana entity with Alston as its sole member.

Badger Mining Corporation, a Wisconsin corporation.

---

[2] "Proppants" are particles injected into the fractures created by fracing. Proppants keep the fractures open after the pressure is withdrawn. Caleb Fielder, *I Drink Your Milkshake: The Status of Hydraulic Fracture Stimulation in the Wake of Coastal v. Garza*, 46 Rocky Mtn. Min. L. Found. J. 17, 19 (2009)

J&P Capital, LLC,[3] a Louisiana limited liability company.

Patrick A. Tesson, a Florida resident.

## B.    Factual Allegations

We draw these allegations from plaintiffs' live petition and their trial court brief opposing defendants' special appearances. *See Flanagan v. Royal Body Care, Inc.*, 232 S.W.3d 369, 374 (Tex. App.—Dallas 2007, pet. denied) (a court considers the plaintiff's allegations in both its pleadings and its special appearance response).

Recent technology advances have increased domestic oil and gas production through hydraulic fracturing or "fracing." Fracing involves using pressure to force proprietary liquids and special sand into the ground through a well bore to the producing zone. There, the liquids and sand open fractures in the formation that holds the hydrocarbons, thereby permitting the hydrocarbons to be recovered and sold. The sand used in fracing is called frac sand, and most or all frac quality sand is located in Wisconsin and Minnesota. This case involves the commercial exploitation of frac sand.

In 2010 and 2011, these individuals began to explore entering the frac sand business: (i) James R. "Rusty" Miller and Richard E. Payne, who had offices in Richardson, Texas; (ii) Kenneth Landgaard, a Minnesotan (iii) Eugene E. Noonan, a Wisconsin land man, and (iv) defendant–appellant Jeffries Alston, a Louisiana engineer.[4] This group formed limited liability companies that in turn leased frac sand sites in Wisconsin and Minnesota.

---

[3] This party refers to itself as "PJ Capital, LLC f/k/a J&P Capital, LLC." We will refer to it as J&P because that is what plaintiffs' live pleading calls it, but we make no determination as to that party's correct legal name.

[4] In their third amended petition, plaintiffs began referring to a "Texas Frac Sand Enterprise." Their live pleading defines the term as meaning the business concept or business plan the individuals were jointly working on: "In 2010, a strategy to locate, produce, treat, market, transport and sell hydraulic fracking ('frac') sand, a concept later embodied in NF Holdings' original business plan (the 'Texas Frac Sand Enterprise'), was created by and among numerous individuals in Texas, Wisconsin and Minnesota." But in other places their live pleading suggests that the "Texas Frac Sand Enterprise" may be an entity with separate legal existence. For instance, it refers to "the actions of the Texas Frac Sand Enterprise" and "the Texas Frac Sand Enterprise's Goose Landing Plant at Alma Center, Wisconsin." Landgaard, Payne, Miller, Noonan, Alston, and others collaborated to some extent in an effort to create a frac sand business or enterprise, and we refer to their collaboration as a frac sand business or frac sand enterprise. But the ambiguous (and loaded) term "Texas Frac Sand Enterprise" is unhelpful to our analysis.

The group unanimously agreed to hire a Dallas, Texas law firm to formulate a suitable corporate structure. In September 2011, that firm formed NF Holdings to hold the group's assets, including trade secrets and confidentiality agreements. Miller and Payne served as two of NF Holdings' managers and officers.

According to the initial estimate, the nascent frac sand business needed $150 million in funding. So, NF Holdings contracted with Windward Capital, LLC, to help raise that funding.

In late 2012, Landgaard organized and chartered NFP I. NFP I had two series subsidiaries, NFP Series-1 and NFP Series-2. NFP I was intended to serve as NF Holdings' successor and to bring the frac sand business to completion. In 2012–2013, a detailed business plan was finalized and a marketing website was created.

The boundaries between NF Holdings and NFP I, however, blurred as (i) NFP I began to use the website and (ii) NF Holdings' principals began to use NFP I business cards and advertising materials.

In April 2013, NFP Series-2 acquired rights in a frac sand quarry in Goose Landing in Alma Center, Wisconsin. That same month, NFP Series-1 entered into a contract to sell frac sand, resulting in positive cash flow. NFP Series-2 eventually acquired the Goose Landing quarry outright.

Alston allegedly embarked on a scheme to steal the frac sand business's assets. In August 2013, without plaintiffs' knowledge, he used Baker Botts's Houston office to charter defendant–appellant NFP II. Noonan and Windward Capital were members of NFP II.

The plaintiffs and defendant group entities are shown below:



In late 2013, NFP II obtained $77 million in funding from Deutsche Bank. At this same time, NFP II also began using the existing frac sand business's assets and trade secrets. In plaintiffs' words, those assets and trade secrets "magically and mysteriously appeared" within NFP II. NFP II also began using plaintiffs' website and conducted a frac sand business with many Texas contacts. At some point, Alston filed a fraudulent certificate of cancellation for NFP I.

Defendants–appellees Tesson and J&P got involved in 2014. Tesson and Alston founded J&P in April of that year. J&P purportedly invested millions of dollars in NFP II in exchange for preferred equity, and Tesson became an NFP II manager and co-CEO.

Also during 2014, the Goose Landing Plant came on line to process and sell sand.

In late 2014, NFP II began secret negotiations to sell the frac sand enterprise to defendant–appellant Badger.

## C. Procedural History

In February 2015, NF Holdings sued appellants NFP II, Alston, Lamstex, and others not relevant to this appeal. The original petition alleged most of the facts recited above, asserted several claims, and sought to enjoin NFP II from transferring its assets. NFP II, Lamstex, and Alston filed special appearances.

Three months later, NF Holdings filed a second amended original petition that added NFP Series-1 as a plaintiff and Tesson, J&P, and Badger as defendants. This petition alleged that Tesson had testified in court that NFP II sold the "Frac Sand Enterprise" to Badger in a transaction that closed in April 2015. Tesson, J&P, and Badger also filed special appearances.

An October 2015 third amended petition changed the plaintiffs to NF Holdings, NFP I, and NFP I's series subsidiaries. It also dropped some defendants, leaving only NFP II, Lamstex, Alston, Badger, Tesson, and J&P as defendants.

The plaintiffs filed a fourth amended petition against the same defendants a few days later. That petition, which is the live pleading, asserts (i) statutory misappropriation of trade secrets; (ii) common law misappropriation of trade secrets; (iii) conversion; (iv) fraudulent transfer; and (v) conspiracy claims against all defendants. It also asserts a fiduciary breach claim against Alston. The petition further alleges that general and specific personal jurisdiction apply to all defendants.

The parties filed special appearance briefs, evidence, and objections to and motions to strike their opponents' evidence.

The trial court held a hearing at which plaintiffs introduced deposition excerpts and documents into evidence. The trial court later granted Tesson's and J&P's special appearances and denied the rest. The parties requested findings of fact and conclusions of law, but the trial court never made any.

Alston, NFP II, and Lamstex filed a joint notice of interlocutory appeal; Badger filed a separate notice of appeal; and plaintiffs also filed a joint notice of appeal.

The trial court later ruled on some of the objections and motions to strike evidence.

## II. APPLICABLE LAW

### A. The Law of Personal Jurisdiction

Because the Texas long-arm statute, civil practice and remedies code § 17.042, reaches as far as due process allows, Texas courts may exercise personal jurisdiction over a nonresident defendant if (i) the defendant has minimum contacts with Texas and (ii) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007).

The minimum contacts test focuses on whether the defendant has purposefully availed itself of the privilege of conducting activities in the forum state. *See Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005). In making this determination, we consider (i) only the defendant's own actions and not the unilateral activity of another, (ii) whether the defendant's actions were purposeful rather than random, isolated, or fortuitous, and (iii) whether the defendant sought some benefit, advantage, or profit by availing itself of the privilege of doing business in Texas. *Id*. at 785. "[J]urisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business." *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 660 (Tex. 2010) (emphasis original). The minimum contacts test varies depending on whether the plaintiff relies on "specific jurisdiction" or "general jurisdiction." *Lensing v. Card*, 417 S.W.3d 152, 156 (Tex. App.—Dallas 2013, no pet.).

For specific jurisdiction, minimum contacts are present if (i) the defendant purposefully availed itself of the forum state and (ii) there is a substantial connection between the defendant's

forum contacts and the operative facts of the litigation. *Id.* We focus on the relationship among the defendant, the forum, and the litigation. *Moki Mac*, 221 S.W.3d at 575–76.

Additionally, a nonresident's knowledge that its conduct outside the forum state will cause harmful effects to a forum resident, without more, is insufficient to create specific jurisdiction minimum contacts. *See, e.g.*, *Walden v. Fiore*, 134 S. Ct. 1115, 1125 (2014); *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 68–69 (Tex. 2016).

Furthermore, specific jurisdiction requires a claim-by-claim analysis unless all claims arise from the same forum contacts. *Lensing*, 417 S.W.3d at 156.

If, however, the plaintiff's claims are unrelated to the defendant's forum contacts, the plaintiff must rely on general jurisdiction. General jurisdiction is proper only if the defendant's forum contacts are so continuous and systematic that the defendant is essentially at home in the forum state. *See TV Azteca v. Ruiz*, 490 S.W.3d 29, 37 (Tex. 2016). This "at home" standard means that the defendant's forum activities must be "comparable to a domestic enterprise" in the forum state. *Daimler AG v. Bauman*, 134 S. Ct. 746, 758 n.11 (2014).

For a corporation, its state of incorporation and its principal place of business are paradigm bases for general jurisdiction. *Id. Daimler*, however, left open the possibility that in an "exceptional case" a corporation's operations in another state might be so substantial as to render it "at home" there. *Id.* at 761 n.19. But the Court recently explained that *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952), in which Ohio was held to have jurisdiction over a Philippines corporation that had, during World War II, conducted its limited operations in Ohio, exemplified the "exceptional case" mentioned in *Daimler*. *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017).

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile . . . ." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011).

But, even if minimum contacts are present, a state may not exercise personal jurisdiction over a nonresident defendant if doing so would violate traditional notions of fair play and substantial justice. *Id.* at 407. In this inquiry, relevant factors include (i) the burden on the defendant, (ii) the forum's interest in adjudicating the dispute, (iii) the plaintiff's interest in convenient and effective relief, (iv) the interstate judicial system's interest in the most efficient resolution of controversies, and (v) the states' shared interest in furthering substantive social policies. *Id.*

## B. The Parties' Burdens and the Standard of Review

The plaintiff bears the initial burden to plead sufficient facts to bring a nonresident defendant within the long-arm statute's reach. *Moki Mac*, 221 S.W.3d at 574. "The plaintiff can satisfy this initial burden by alleging that a nonresident defendant is doing business in Texas." *Proctor v. Buell*, 293 S.W.3d 924, 930 (Tex. App.—Dallas 2009, no pet.). Doing business in this context includes (i) contracting with a Texas resident where either party is to perform the contract in whole or in part in Texas or (ii) committing a tort in whole or in part in Texas. *See* TEX. CIV. PRAC. & REM. CODE § 17.042. We consider the allegations in both the plaintiff's live pleading and its special appearance response. *Flanagan*, 232 S.W.3d at 374.

If the plaintiff carries its burden, the defendant must then negate all pled jurisdictional bases.[5] *Proctor*, 293 S.W.3d at 930. The defendant can do this: (i) factually, by presenting evidence establishing that its Texas contacts are insufficient and thus effectively disproving the

---

[5] However, the plaintiff retains the burden of persuasion as to any theories that would cause another entity's contacts to be imputed to the defendant, such as alter ego. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002).

–10–

plaintiff's allegations, or (ii) legally, by showing that even if the plaintiff's alleged facts are true they are legally insufficient to support jurisdiction. *Kelly*, 301 S.W.3d at 659.

Whether a court can exercise jurisdiction over a nonresident is a question of law. *Id.* at 657. We thus review de novo a trial court's order granting or denying a special appearance. *Moki Mac*, 221 S.W.3d at 574.

When deciding a special appearance, the trial court must resolve any factual disputes that arise. *Am. Type Culture Collection, Inc., v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002). The court, however, must accept as true the clear, direct, and positive evidence of an undisputed affidavit, even one by a party's agent. *Nacho Remodeling Co., Inc. v. Calsherm Partners, L.P.*, No. 05-14-00048-CV, 2014 WL 3828219, at *4 (Tex. App.—Dallas Aug. 5, 2014, no pet.) (mem. op.).

If the trial court does not file findings of fact and conclusions of law, we imply all fact findings necessary to support the judgment and supported by the evidence. *Lensing*, 417 S.W.3d at 155. But implied findings are not conclusive and may be challenged on appeal for legal and factual sufficiency of the evidence. *Id.*

### III. THE ALSTON DEFENDANTS' APPEAL

Defendants Alston, Lamstex, and NFP II (the "Alston defendants") filed a joint appellants' brief. Their first three issues argue that the trial court erred by denying their respective special appearances. Their fourth issue argues that the trial court erred by overruling certain objections to two affidavits and attachments that plaintiffs filed and relied on. For the following reasons, we sustain the Alston defendants' first three issues and conclude that the trial court erred by denying their special appearances. Accordingly, we need not address their fourth issue.

**A.      The Alston Defendants' First Issue:  Did the trial court err by denying Alston's special appearance?**

We start with Alston because he is at the center of the alleged conspiracy to steal plaintiffs' assets.  We first outline his Texas contacts and then determine whether they satisfy the minimum contacts test for general or specific jurisdiction.

**1.      What are Alston's Texas contacts?**

Plaintiffs allege both that (i) Alston individually has contacts with Texas and (ii) the Texas contacts of certain business entities should be imputed to him under the alter ego doctrine.  Accordingly, we first decide whether any other entity's Texas contacts should be treated as his contacts for jurisdictional purposes.  We conclude that they should not because plaintiffs adduced no evidence that any of these entities were his alter ego.

**a.      Alter Ego Allegations**

A plaintiff bears the burden of both pleading and proving a jurisdictional veil-piercing theory.  *See PHC-Minden, L.P. v. Kimberly-Clark Corp.*, 235 S.W.3d 163, 173 (Tex. 2007).  Under an alter ego theory, a plaintiff must prove that the entity's owner (i) controls the entity's internal business operations and affairs and (ii) exercises a degree of control greater than that normally associated with ownership and directorship.  *Id*. at 175.  The control must be so great that the entity ceases to be a separate entity.  *Id*.  Alter ego cannot be based on mere stock ownership, duplication of some or all directors or officers, or exercise of the control that stock ownership gives to stockholders.  *Id*.  Moreover, an entity's owner may monitor the entity's performance, supervise its financial and capital budget decisions, and articulate general policies without becoming fused to the entity for jurisdictional purposes.  *Id*. at 176.

Here, plaintiffs allege four entities as potentially supporting an alter ego theory against Alston: NFP I, NFP II, Alston Equipment Company (AEC), and Lamstex.  Alston asserts there is no evidence to support plaintiffs' alter ego theories for any such entity.  We agree.

## NFP I

Plaintiffs do not allege that Alston exercised an unusual degree of control over NFP I that would justify imputing NFP I's contacts to him.  They instead allege only that Alston filed a certificate of cancellation with the Delaware secretary of state to dissolve NFP I.  Although this allegation is supported with evidence, that fact does not show that Alston exercised an unusual degree of control over NFP I's operations and affairs for alter ego purposes.  Thus, NFP I's Texas contacts may not be imputed to Alston.

## AEC

As to AEC, plaintiffs allege that it is a Louisiana company authorized to do business in Texas.  In an affidavit, Alston testified that he owns AEC and founded it in 1985 in Amite, Louisiana.  He further said that Amite, Louisiana, has always been AEC's principal place of business.  Although plaintiffs' appellees' brief asserts that "[f]or all intents and purposes, Alston is AEC," they cite no evidence showing that Alston exerts an unusual degree of control over AEC, nor have we found any in the record.  Accordingly, plaintiffs adduced no evidence that AEC was Alston's alter ego.

## Lamstex

Plaintiffs allege that Lamstex is a Louisiana limited liability company, but they allege no specific facts to show that Lamstex is Alston's alter ego.  Although their brief argues that "Alston is . . . Lamstex," the evidence they cite is Alston's deposition testimony that Lamstex was not currently "an ongoing concern" and that based on his accountant's advice he was going to "[j]ust let it sit."  This evidence does not show that Alston exerted an unusual degree of control over Lamstex, nor have we found such evidence elsewhere in the record.  Accordingly plaintiffs adduced no evidence that Lamstex was Alston's alter ego.

**NFP II**

Finally we consider whether plaintiffs adduced sufficient evidence that NFP II was Alston's alter ego. Alston executed an affidavit on behalf of NFP II in which he said that NFP II is a limited liability company formed under Delaware law on August 22, 2013, and that he is its president and CEO.

Plaintiffs pled and re-urge on appeal that Alston operated NFP II as if corporate formalities did not exist, but they offer no specific facts to support the assertion. Instead, they refer vaguely to other lawsuits filed against Alston and NFP II by NFP II's minority members, contending that the pleadings in those suits contain "additional allegations" about Alston's disregard of corporate formalities. We have reviewed those pleadings, which plaintiffs filed in this case as evidence. Although those pleadings accuse Alston of wrongdoing against NFP II and its minority members, we see no specific allegations in them, or any record evidence, establishing that Alston exercised enough control over NFP II to permit jurisdictional veil-piercing under *PHC-Minden*.

In sum, there is no evidence that Alston exercised more than normal investor and director control over NFP I, NFP II, AEC, or Lamstex. Accordingly, those entities' Texas contacts are not imputed to him.

> **b.        What are Alston's non-alter ego based Texas contacts?**

Plaintiffs allege that the following facts support specific jurisdiction over Alston:

- Alston "took charge in the theft of" assets such as leases, options, and other real estate interests by creating NFP II and transferring the assets into NFP II. The stolen assets "impacted commerce within Texas," and the theft was aimed at Texas companies.

- Alston also stole trade secrets such as customer lists, business plans, and models. These thefts were also aimed at a Texas company and "directly impact[ed] Texas commerce."

- The fraudulent transfer to Badger was an improper sale of assets rightfully belonging to Texas companies. It was a tort aimed at Texas companies that affected Texas commerce and harmed Texas companies and individuals.

- Alston's fiduciary breaches were directly aimed at plaintiffs, "both Texas companies."

- Alston conspired with the other defendants to accomplish the fraudulent transfer to Badger.

Plaintiffs allege these additional facts support general jurisdiction against Alston:

- His principal place of business is his pickup truck, which is outfitted with state-of-the-art electronics allowing him to communicate and transact business wherever he is. When he is not at his home in Louisiana, he is generally in Texas, transacting business.

- He is the president, sole director, and primary stockholder of AEC, a Louisiana corporation authorized to do business in Texas. AEC's website identifies its offices as being in Houston and Rockwall, Texas. AEC's marketing materials claim that AEC has four offices that cover Louisiana, Mississippi, Oklahoma, and Texas.

- He is also the only member and manager of Lamstex, a Louisiana limited liability company that has done business in Texas and has a Texas sales tax ID number.

- He "consistently conducts business in Texas, personally and on behalf of AEC and Lamstex from his 'mobile office.'" And he has marketed himself and his businesses as having "'extensive business contacts with companies in Texas.'"

- In connection with the frac sand enterprise, he came to Texas ten times for meetings with various people and engaged in other business activities connected to Texas. These activities included a sales contract; an attempt to hire an employee; soliciting loans to fund NFP I; and the hiring of attorneys to (i) represent his interests during the formation of NF Holdings, (ii) charter NFP II, and (iii) defend him in two Houston lawsuits arising from NFP II's asset sale to Badger.

Having identified Alston's Texas contacts, we turn to whether those contacts constitute sufficient minimum contacts to support a Texas court's general or specific jurisdiction over him.

–15–

**2.    General Jurisdiction: Is Alston essentially at home in Texas?**

Plaintiffs allege that Alston is subject to general jurisdiction in Texas. Although he occasionally refers to evidence, Alston argues primarily that plaintiffs' allegations, even if true, fail to establish that he has sufficient minimum contacts with Texas. We consider his argument as a legal challenge to the sufficiency of plaintiffs' jurisdictional allegations. *See Kelly*, 301 S.W.3d at 659 (a defendant can prevail by showing that plaintiffs' allegations, even if true, are insufficient to establish jurisdiction). And we conclude that the above listed contacts do not suffice to establish general jurisdiction over Alston.

Plaintiffs do not allege that Alston is domiciled in Texas, and they concede that he resides in Louisiana. They allege that Alston is generally in Texas transacting business when he is not at his home in Louisiana, but they do not allege how much of his time Alston actually spends in Texas. Furthermore, plaintiffs do not allege that he comes to Texas for any reason except to conduct business. Accordingly, on this record, we see no basis supporting that Texas is essentially his second domicile. *See Domicile*, BLACK'S LAW DICTIONARY (10th ed. 2014) (domicile is "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere").

Even if plaintiffs' allegations regarding Alston's Texas business contacts constituted a substantial, continuous, and systematic course of business in this state, the Supreme Court rejects this standard as insufficiently demanding for general jurisdiction. *Daimler AG*, 134 S. Ct. at 760–61. Therefore, because plaintiffs' allegations regarding Alston's Texas conduct do not establish that he is essentially "at home" in Texas, they do not support general jurisdiction.

**3.** **Specific Jurisdiction: Did Alston purposefully avail himself to Texas to a degree sufficient to subject him to personal jurisdiction here?**

Plaintiffs also allege specific jurisdiction against Alston, so he bore the burden to either disprove the alleged contacts with Texas or demonstrate that the alleged facts are legally insufficient to establish specific jurisdiction. *See Kelly*, 301 S.W.3d at 659. His argument seems to blend a legal challenge to plaintiffs' jurisdictional pleadings with a factual challenge based on the evidence.

**a.** **Additional Specific Jurisdiction Case Law**

The specific jurisdiction minimum contacts test requires (i) purposeful availment and (ii) relatedness. *Moki Mac*, 221 S.W.3d at 576. We review the leading cases fleshing out these elements before applying them to this case.

Plaintiffs posit that "personal jurisdiction may be found where a defendant takes part in any aspect of a tortious scheme that impacts Texas citizens, regardless of a defendant's other links to this State." This is not correct.

The Supreme Court recently clarified that the proper inquiry is whether the nonresident's conduct is aimed at the forum *state*—the question is "not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 134 S. Ct. at 1125. Or, as the Texas Supreme Court has explained, "[m]ere knowledge that the 'brunt' of the alleged harm would be felt—or have effects—in the forum state is insufficient to confer specific jurisdiction." *Searcy*, 496 S.W.3d at 68–69; *see also TV Azteca*, 490 S.W.3d at 43 ("[T]he fact that the plaintiff lives and was injured in the forum state is not irrelevant to the jurisdictional inquiry, but it is relevant only to the extent that it shows that *the forum state* was the focus of the activities of the defendant.") (internal quotation and citation omitted) (emphasis original).

–17–

Thus, the minimum contacts test is not automatically satisfied by non-forum conduct that causes effects felt by forum residents. Rather, the nonresident defendant must have focused his activities on the forum state. Here, plaintiffs argue that defendants "stole [plaintiffs'] intellectual property and other intangible assets, then fraudulently transferred them." So we survey specific jurisdiction cases—particularly cases regarding theft, misappropriation, conversion, and the like—to determine what level of forum activity is necessary to amount to purposeful availment.

### (1). Purposeful Availment

The following cases illustrate that purposeful availment occurs when a nonresident defendant (i) comes to Texas and acquires tangible personal property, (ii) comes to Texas and acquires intangibles such as trade secrets with an intent to do more business in Texas, or (iii) remains outside of Texas but acquires or causes the acquisition of Texas real estate or Texas businesses:

- A nonresident who came to Texas, bought and took possession of tangible personal property, and took it back to his home state purposefully availed himself of Texas for purposes of resulting conversion and civil theft claims. *Lensing*, 417 S.W.3d at 158–61.

- A nonresident who acquired Texas real estate purposefully availed itself of Texas for purposes of a fraudulent transfer claim arising from the transfer. *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339–40 (Tex. 2009).

- A nonresident who came to Texas for business meetings at which it received trade secrets about a proposed Texas joint venture purposefully availed itself of Texas for purposes of a trade secret misappropriation claim tied to those trade secrets. *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 151–54 (Tex. 2013). The court later emphasized that it was important that the nonresident in *Moncrief Oil* was interested in establishing a long term joint venture in Texas. *See Searcy*, 496 S.W.3d at 75.

- Nonresidents who formed a subsidiary and funded that subsidiary's acquisition of Texas hospitals purposefully availed themselves of Texas for purposes of a claim that the purchase amounted to tortious interference. *Cornerstone Healthcare Grp. Holding, Inc. v. Nautic Mgmt. VI, L.P.*, 493 S.W.3d 65, 71–74 (Tex. 2016).

–18–

However, as the following cases show, if the nonresident does not come to Texas, seek out Texas business, or acquire real property or business operations located in Texas, courts generally do not find purposeful availment:

- A nonresident who bought shares of a foreign company that had foreign business operations did not purposefully avail itself of Texas even if the shares' seller had operations in Texas and communicated from Texas with the nonresident buyer. *Searcy*, 496 S.W.3d at 73–77.

- A nonresident IRA manager that received an application and investment funds from a Texan, without having advertised in Texas or solicited the Texan's business, did not purposefully avail itself of Texas by accepting the funds and investing them according to the Texan's instructions. *IRA Res., Inc. v. Griego*, 221 S.W.3d 592, 596–99 (Tex. 2007) (per curiam).

- Nonresidents that executed a complex transaction outside of Texas did not purposefully avail themselves of Texas in the transaction even though early negotiations eventually leading to the transaction occurred at two meetings in Texas. *M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, No. 15-0083, 2017 WL 889938, at *6–7 (Tex. Mar. 3, 2017).

- Nonresident that acquired plaintiff's trade secrets outside of Texas and disclosed the trade secrets to others outside of Texas did not purposefully avail itself of Texas, even if a recipient of the secrets then unilaterally sent them to Texas. *RSM Prod. Corp. v. Global Petroleum Grp., Ltd.*, 507 S.W.3d 383, 393–95 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

### (2). Relatedness

*Moki Mac* is the leading case concerning the other specific jurisdiction requirement, relatedness. There the supreme court held that minimum contacts are present only if there is a "substantial connection" between the defendant's forum contacts and the operative facts of the litigation. 221 S.W.3d at 585. "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.).

With these principles in mind, we address our specific jurisdiction analysis.

### b. Application of the Law to the Facts

Courts must ordinarily analyze specific jurisdiction on a claim-by-claim basis, but we need not do so if claims arise from the same forum contacts. *Moncrief Oil*, 414 S.W.3d at 150–51. In this case, plaintiffs argue that all of their claims arise from the same forum contacts. They sue Alston for statutory and common law misappropriation of trade secrets, breach of fiduciary duty, conversion, fraudulent transfer, and conspiracy.

We agree with plaintiffs that all of their claims arise from one alleged course of conduct: Alston allegedly acquired plaintiffs' trade secrets, created a competing frac sand business in NFP II, wrongfully transferred plaintiffs' trade secrets and other assets into NFP II, and conspired with the other defendants to sell the assets to Badger. We analyze Alston's contacts in two groups: (i) the alleged thefts of "Texas assets" and (ii) other Texas contacts.

### (1). Do Alston's alleged thefts of "Texas assets" support specific jurisdiction?

Plaintiffs' principal specific jurisdiction theme is that Alston and the other defendants combined to steal Texas-based companies' intellectual property and other assets. Their jurisdictional allegations emphasize that the thefts affected Texas commerce and injured Texas companies, but these facts, even if true, have no weight under *Walden* and its progeny. The question is instead whether Alston's alleged theft of the assets—which plaintiffs urged at oral argument were "Texas assets" because they were created and owned by Texas companies (i.e., plaintiffs)—connected him to Texas in a meaningful way sufficiently related to these claims. *See Walden*, 134 S. Ct. at 1125; *Moki Mac*, 221 S.W.3d at 584–85; *see also Kelly*, 301 S.W.3d at 660 ("[J]urisdictional analysis always centers on the *defendant's* actions and choices to enter the forum state and conduct business."). We conclude it did not.

Plaintiffs filed a bench exhibit shortly before oral argument in which they (i) identify, with record references, the intellectual property that they claim was stolen and sold to Badger

–20–

and (ii) assert that the "situs" for these assets was Houston, Texas.  The listed property separates into three categories.

One, there are the real property interests regarding the frac sand and rail facilities themselves, which plaintiff describe as "Construction/Land Rights" and "Leases and Options." Plaintiffs do not argue that the real property is located in Texas, and their live pleading indicates that the referenced real property must be located in Minnesota or Wisconsin, where they allege most or all the available frac sand is located.  The only sand mining plant that plaintiffs mention as actually being developed was at the Goose Landing quarry in Wisconsin.  Theft of these out of state assets, however, does not show purposeful availment of Texas.

Two, plaintiffs identify a long list of permits and licenses, including a town permit, county permits, state permits, a USACE permit, and "CN Permits/Licenses."  But they do not identify any pleading or evidence suggesting that these permits and licenses were issued by any Texas authority or relate to any activities conducted in Texas.  Again, given the allegation that all minable frac sand is in Minnesota and Wisconsin, and given that the only sand plant alleged to be operating is in Wisconsin, the only reasonable inference is that these permits and licenses relate entirely to Wisconsin or Minnesota activities and were not issued by any Texas authority. Theft of these assets does not indicate any purposeful availment of Texas.

Three, plaintiffs identify several categories of intangibles that Badger allegedly bought after the other defendants stole the assets: (i) a non-competition agreement by Alston, Tesson, and others; (ii) NFP II's goodwill; (iii) trade secrets described as customer lists, relationships, experience, and confidentiality and nondisclosure agreements; and (iv) some vendor and supply agreements.  We discuss each category in turn.

First, the alleged theft of non-competition agreements does not indicate any purposeful availment targeting Texas, for the following reasons.  None of the parties to the non-competition

–21–

agreements are Texas residents. The parties are Badger, NFP II, Alston, Tesson, Brian Mora, Daniel Koxlien, and Gene Noonan. As discussed elsewhere in this opinion, Badger is a Wisconsin corporation, NFP II is a Delaware limited liability company, Alston is a Louisiana resident, and Tesson is a Florida resident. Mora is a Louisiana resident, and Koxlien and Noonan are Wisconsin residents. Moreover, the agreements contain a Wisconsin choice of law clause and a Wisconsin forum selection clause.

Second, theft of NFP's goodwill, which is described in the Badger asset purchase agreement as "Goodwill and Going Concern Value," also does not indicate purposeful availment of Texas. According to Alston's uncontroverted affidavit testimony, NFP II's only product was frac sand, all of the sand came from its plant in Wisconsin, and all sand customers took possession and ownership of the sand in Wisconsin. Thus, NFP II's goodwill and going concern value, to the extent such an intangible can be said to have a location, would have centered on its operational sand plant in Wisconsin.

Third, the trade secrets plaintiffs identify as having been stolen do not have any particular tie to Texas. Although they are vaguely described, these trade secrets appear to consist of information useful for exploiting and monetizing frac sand—which, again, must come from Wisconsin or Minnesota. There is no allegation that Alston obtained these trade secrets in Texas, as the defendant in *Moncrief* did. *See* 414 S.W.3d at 153. Any Texas connection, such as the fact that the information is also known to Texas residents like plaintiffs or could be used in Texas, is fortuitous rather than purposeful by Alston.

Finally, we conclude that the allegedly stolen vendor and supply agreements do not demonstrate that Alston purposefully availed himself of Texas. Plaintiffs allege that at least some of the purchasers were Texas companies. But the product to be sold was the Wisconsin sand, and the means to produce it was the Goose Landing mining facility. And there are

potential customers around the country. From Alston's perspective, the fact that some of the Wisconsin sand was going to be sold to Texas buyers was fortuitous rather than a purposeful seeking of benefit, advantage, or profit from Texas's laws. *See Michiana*, 168 S.W.3d at 785 ("[A] defendant must seek some benefit, advantage, or profit by 'availing' itself of the jurisdiction.").

Nonetheless, plaintiffs argue that *Cornerstone Healthcare* compels the conclusion that specific jurisdiction applies here. In that case, non-Texans created a chain of subsidiaries that ended with a subsidiary with its principal place of business in Texas. The nonresidents simultaneously funded the purchase of a chain of Texas rehabilitation hospitals and caused the Texas subsidiary to acquire those hospitals. The Texas Supreme Court held that the nonresidents were subject to specific jurisdiction in Texas for claims arising from the hospital purchase. Plaintiffs emphasize the supreme court's observation that the nonresident defendant "targeted Texas assets in which to invest and sought to profit from that investment." 493 S.W.3d at 73 (footnote omitted). But *Cornerstone Healthcare* is distinguishable because the assets there were rehabilitation hospitals located and carrying out their profit-making activities in Texas. Here, however, the assets center on a Wisconsin sand quarry that conducts its profit-making activities in Wisconsin. The location of the quarry's customers, whether Texas or elsewhere, is fortuitous. In short, Alston sought to profit from selling a Wisconsin frac sand business; he did not seek any advantage, benefit, or profit from Texas law.

Plaintiffs also rely on *Vizant Technologies, LLC v. Whitchurch*, 97 F. Supp. 3d 618 (E.D. Pa. 2015). The *Vizant* court held that Georgia residents formerly employed by a Pennsylvania company were subject to specific jurisdiction in Pennsylvania for trade secret misappropriation claims because any misappropriation "was calculated to have a detrimental impact on a company located" in Pennsylvania and because the conduct "was 'expressly aimed' at causing harm to an

entity which defendants knew was headquartered in Pennsylvania." *Id*. at 631, 632. The *Vizant* court further emphasized that the defendants knew that the plaintiff would suffer the brunt of the harm in Pennsylvania. *Id*. at 632. But *Vizant* did not cite *Walden*, and its holding is not consistent with the Supreme Court's statement that "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." 134 S. Ct. at 1125. *Walden* also emphasized that a defendant does not create sufficient contacts with another state merely by directing his conduct at a plaintiff that he knows has connections with that state. *Id*. We conclude that *Vizant* is inconsistent with *Walden* and thus not persuasive.

On the other hand, Alston relies on a federal case involving a dispute over patent ownership, *VSIM Patent Co, LLC v. Benson*, No. C12-102RSL, 2012 WL 2115373 (W.D. Wash. June 11, 2012). The defendant contested personal jurisdiction, and the court dismissed the case after invoking two premises derived from *Shaffer v. Heitner*, 433 U.S. 186 (1977):

- The presence of property in a state merely gives rise to an inference of personal jurisdiction by providing contacts among the state, the defendant, and the litigation.

- No such inference of personal jurisdiction arises if the property at issue is chattel and there is no indication that the defendant took any action to invoke the protections of the forum state.

*VSIM Patent Co*, 2012 WL 2115373, at *3. We agree. Here, there is no indication that Alston took any action concerning the allegedly stolen intangibles that would invoke Texas's legal protections. Thus, plaintiffs' allegations about stolen intangibles do not demonstrate Alston's purposeful availment of Texas.

### (2). Do Alston's other alleged contacts support specific jurisdiction?

Plaintiffs' other jurisdictional allegations against Alston consist principally of: (i) soliciting loans from Texas residents to fund NFP I and then causing NFP II to repay them, (ii)

–24–

attempting to hire an individual (apparently in Texas) as an employee, first for NFP I and then for NFP II, (iii) hiring Texas lawyers for various purposes related to the frac sand business, and (iv) attending ten frac sand related meetings in Texas. We conclude these allegations do not establish specific jurisdiction over Alston.

We discount the allegations regarding loans and attempts to hire an employee because they are not sufficiently related to plaintiffs' claims in this case because we see no substantial connection between these alleged Texas contacts and the misappropriation and conversion claims. *See Moki Mac*, 221 S.W.3d at 585 (substantial connection test turns on whether the Texas contacts will be the focus at trial); *accord Cornerstone Healthcare*, 493 S.W.3d at 74.

We likewise conclude that Alston's hiring of Texas lawyers is not sufficiently related to plaintiffs' claims in this case. More particularly, Alston's hiring of Texas lawyers to represent his interests when forming NF Holdings and to defend him in the two Houston lawsuits are not substantially connected to plaintiffs' claims in this case. Furthermore, his hiring of Texas lawyers to assist with forming NFP II, the alleged vehicle of the thefts, is only remotely related to the thefts themselves. Additionally, Alston's hiring of lawyers will not be the focus of any trial of plaintiffs' claims. Thus, these contacts fail the relatedness test. *See Moki Mac*, 221 S.W.3d at 585.

Next, the allegations that Alston participated in several frac sand related meetings in Texas also fall short. Specifically, plaintiffs do not allege that Alston acquired trade secrets or other assets in those meetings. Thus, this case is unlike *Moncrief Oil*, in which the nonresident defendant received trade secrets at meetings in Texas aimed at forming a joint venture in Texas. *See* 414 S.W.3d at 151–54. Here, however, there are no similar allegations showing a substantial connection between plaintiffs' claims and Alston's participation in Texas meetings, which could have occurred elsewhere.

Nonetheless, plaintiffs argue that *Lewis v. Indian Springs Land Corp.*, 175 S.W.3d 906 (Tex. App.—Dallas 2005, no pet.), supports the premise that even unrelated Texas contacts should be considered for purposes of a Texas-centered specific jurisdiction analysis. In that case Lewis, a Florida resident, became involved in a number of transactions and Texas businesses regarding a California real estate development. In connection with this business, Lewis became president of ISLC, a Nevada corporation with *its* principal executive offices in Texas. He also traveled to Texas at least five times in five years to manage his interests in the venture.

After the property was sold, ISLC was owed money on the buyer's promissory note, and ISLC also owed substantial sums on promissory notes owed to its investors (including Lewis). Lewis eventually negotiated a partial payment with ISLC's debtor and then caused ISLC to use that money to pay its own promissory notes, including notes owed to Lewis.

ISLC and two other Texas business entities[6] then sued Lewis in Texas, alleging that he breached numerous legal duties by distributing the funds the way he did. We held that Lewis was subject to personal jurisdiction in Texas in that case because he purposefully established contacts with Texas in many ways: Specifically, he (i) engaged in meetings in Texas about the investment over the years, (ii) became president and a shareholder of ISLC, a company with its principal executive offices in Texas, and (iii) caused ISLC to pay him on a promissory note that was payable in Texas and governed by Texas law. Furthermore, Lewis sought to benefit or profit from the protections of Texas law by engaging in the many transactions culminating in the final disbursement of funds that triggered the lawsuit.

Factually, *Lewis* is not similar to the present case. Moreover, we do not read *Lewis* to hold that unrelated contacts are relevant in a specific jurisdiction analysis. Regardless, *Lewis* must be read in light of the supreme court's subsequent *Moki Mac* opinion, which established the

---

[6] One was ISJV, which owned the California real estate development. The other was ISIP, which was co-owner of ISJV with ISLC.

"substantial connection" requirement Texas courts now use in specific jurisdiction cases. *See Moki Mac*, 221 S.W.3d at 584–85.

Additionally, *Lewis* met the relatedness requirement because (i) ISLC was a corporation with its principal executive offices in Texas, and (ii) Lewis, its president, caused ISLC to pay relevant promissory notes including at least one that was payable in Texas and governed by Texas law. *See* 175 S.W.3d at 916–18. Claims arising from those payments were substantially connected to Lewis's Texas contacts as ISLC's president. There is no similar connection between Alston's Texas contacts and the theft and misappropriation claims in this case.

Next, plaintiffs cite *TV Azteca v. Ruiz* for the premise that a nonresident's unrelated Texas contacts can be relevant to a specific jurisdiction inquiry "not to establish that those contacts constitute [the defendant's] minimum contacts with Texas, but to establish that the actionable conduct in Texas itself constitutes minimum contacts." 490 S.W.3d at 54. In *Ruiz*, the question was whether allegedly defamatory television broadcasts made in Mexico but viewable in Texas afforded Texas courts specific jurisdiction over the Mexican broadcasters. The court held that specific jurisdiction was proper if the broadcasters targeted Texas by continuously and deliberately exploiting the Texas market. *Id*. at 47. The court concluded that the broadcasters had done so, considering evidence that the broadcasters had sent personnel into Texas to promote their programs, derived substantial revenue by selling advertising to Texas businesses, and otherwise attempted to distribute their programs and increase their popularity in Texas. *Id*. at 49–51. Thus, the court considered the defendants' other conduct because it showed that the defendants' conduct being sued on—the broadcasts themselves—amounted to purposeful availment of Texas as opposed to random, isolated, or attenuated contact. *See id*. at 52. The court expressly analogized *TV Azteca* to stream-of-commerce cases in which products enter the

stream of commerce outside the forum state but end up inside the forum state and cause harm there. *Id*. at 54.

Unlike *TV Azteca*, the present case is not analogous to stream-of-commerce cases. Plaintiffs do not claim that the frac sand entered Texas and caused their injuries there, like the broadcasts in *TV Azteca* or the tangible products in stream-of-commerce cases. Rather, they claim that Alston stole their rights to frac sand located in Wisconsin, as well as related trade secrets and other intangibles, thereby causing them harm felt in Texas.

### c.       Conclusion

In sum, Plaintiffs' claims are not substantially connected to Alston's purposeful availment of the privilege of conducting activities in Texas. Accordingly, the minimum contacts necessary to support specific jurisdiction are absent, and Texas cannot exercise specific jurisdiction over Alston. We thus do not address the second prong of the due process test, whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice. *See O'Daire v. Rowand Recovery, LLC*, No. 05-16-01097-CV, 2017 WL 930036, at *4 (Tex. App.—Dallas Mar. 9, 2017, no pet.) (mem. op.).

For the foregoing reasons, we sustain the Alston defendants' first issue and conclude that the trial court erred by denying Alston's special appearance.

**B.     The Alston Defendants' Second Issue: Did the trial court err by denying Lamstex's special appearance?**

**1.     Lamstex's Texas Contacts**

Plaintiffs allege the following jurisdictional facts against Lamstex:

- Lamstex is a Louisiana limited liability company that has engaged in business in Texas.

- Public records indicate that Alston is Lamstex's only member and manager. But according to Alston's promotional materials, Lamstex is a wholly owned subsidiary of Alston's other company, AEC. For all intents and purposes, Alston is Lamstex.

–28–

- "Lamstex" is an acronym formed from the abbreviations for Louisiana, Mississippi, and Texas. Its promotional materials say that these states are Lamstex's target markets and that Lamstex has previously done business in them.

- Lamstex has a Texas tax ID number, which it has had since 2005. Its reports have been timely filed, and its status as a Texas taxpayer is "active and in good standing."

- Alston has consistently conducted Lamstex business in Texas from his mobile office. Alston participated in Texas meetings about the frac sand enterprise, and engaged in other Texas-directed conduct regarding the frac sand enterprise, personally and on Lamstex's behalf.

- Alston's interest in NF Holdings, which has its home office in Texas and does business in Texas, "was placed into Lamstex."

- Lamstex engaged the Texas attorneys who formed NF Holdings.

**2.    Application of the Law to the Facts**

Plaintiffs' specific jurisdiction allegations against Lamstex and against Alston are the same. We have already concluded that Texas lacks specific jurisdiction over Alston in this matter, so the same result applies to Lamstex.

As to general jurisdiction, the question is whether Lamstex's Texas contacts are so continuous and systematic that it is essentially at home here. *See TV Azteca*, 490 S.W.3d at 37. Lamstex is not "at home" in Texas unless its Texas activities are "comparable to a domestic enterprise" here. *See Daimler AG*, 134 S. Ct. at 758 n.11. We conclude that, even assuming the truth of plaintiffs' allegations, the alleged facts are legally insufficient to establish general jurisdiction. *See Kelly*, 301 S.W.3d at 659.

Specifically, plaintiffs allege in essence that Lamstex is a Louisiana company that has done business in Texas. But the Supreme Court has rejected the premise that a corporation is subject to general jurisdiction in every state where it engages in a substantial, continuous, and systematic course of business. *Daimler AG*, 134 S. Ct. at 760–61. So plaintiffs' allegations that

Lamstex has done various kinds of business in Texas fall short of establishing the propriety of general jurisdiction in Texas.

Likewise, allegations that Lamstex has a Texas sales tax ID number and that its status as a Texas sales taxpayer is "active and in good standing" do not suffice to support general jurisdiction. We have held that general jurisdiction contacts are not established by showing that foreign business entities (i) paid Texas franchise taxes, (ii) were registered to do business in Texas, and (iii) had registered agents for service of process in Texas. *Asshauer v. Glimcher Realty Trust*, 228 S.W.3d 922, 933 (Tex. App.—Dallas 2007, no pet.). Accordingly, the sales tax allegations against Lamstex also do not suffice for purposes of general jurisdiction.

For the foregoing reasons, we hold that Lamstex lacks minimum contacts with Texas. Thus, we need not address the fair play and substantial justice prong of the due process test. *See O'Daire*, 2017 WL 930036, at *4. We sustain the Alston defendants' second issue and conclude that the trial court erred by denying Lamstex's special appearance.

C. **The Alston Defendants' Third Issue: Did the trial court err by denying NFP II's special appearance?**

1. **Specific Jurisdiction**

Plaintiffs' specific jurisdiction allegations against NFP II are essentially the same as plaintiffs' specific jurisdiction allegations against Alston. We have already concluded that Texas lacks specific jurisdiction over Alston in this matter, so the same result applies to NFP II.

2. **General Jurisdiction**

Our NFP II general jurisdiction analysis differs from our analysis for Alston and Lamstex because NFP II's argument is a factual argument based largely on its special appearance evidence rather than a legal argument that plaintiffs' pled facts, even if true, are insufficient to support jurisdiction. Thus, we examine the evidence, implying all fact findings that are necessary to support the trial court's ruling and supported by the evidence. *See Moki Mac*, 221

–30–

S.W.3d at 574. We must also accept as true the clear, direct, and positive evidence of an undisputed affidavit, even one by a party's agent. *Nacho Remodeling Co., Inc. v. Calsherm Partners, L.P.*, No. 05-14-00048-CV, 2014 WL 3828219, at \*4 (Tex. App.—Dallas Aug. 5, 2014, no pet.) (mem. op.).

### a.     The Evidence Regarding NFP II's Texas Contacts

We first briefly summarize the pleadings because they frame the jurisdictional dispute. *See Kelly*, 301 S.W.3d at 658 n.4. The gist of plaintiffs' live pleading is that NFP II is subject to general jurisdiction in Texas because it is based or headquartered in Houston, Texas. Plaintiffs allege that this fact is supported by NFP II's (i) formation agreement, (ii) advertisements and press releases, (iii) contracts with third parties, (iv) actual use of a Houston office, (v) hiring of Texas professionals, and (vi) representations in government documents and correspondence.

### (1).     NFP II's Evidence

NFP II relies principally on Alston's affidavit testimony to establish the following facts:

- NFP II is a limited liability company formed under Delaware law on August 22, 2013. Alston is its president and CEO.

- NFP II's headquarters and principal office are located in Amite City, Louisiana. That is where its high-level officers direct, control, and coordinate NFP II's activities and where NFP II's books and records are maintained.

- NFP II sold substantially all of its assets to Badger Mining Corporation on April 13, 2015.

- NFP II had approximately 30 employees. One employee was in Texas. He was a salesperson who worked out of his house. Most of the other employees worked at the company's Wisconsin sand plant.

- NFP II's only product was frac sand, and all of that sand came from its Wisconsin frac sand plant. All sand sales occurred in Wisconsin, and customers took possession and ownership of the sand when it was placed on the railcar at the Goose Landing site in Wisconsin.

- NFP II acquired the Goose Landing site through negotiations in Wisconsin. First, NFP II acquired from NFP Series 2 the option to buy Goose Landing. In November 2013, NFP II exercised the option and

–31–

bought the real estate. NFP II built the sand plant at Goose Landing in 2014.

• Contrary to some press releases, NFP II does not have and has never had or occupied an office in Texas. Although NFP II's website once identified its address as an address in Houston, Texas, that was actually an office of another of Alston's companies, AEC. No NFP II employees ever worked out of the Houston office. NFP II never had any meetings with Windward Capital or any customer meetings at the Houston office. Except for calls on customers or prospective customers, NFP II conducted all of its business in Louisiana or Wisconsin. Accordingly, neither NFP II's principal office nor its principal place of business is located in Texas.

• NFP II has never owned any Texas real property, had a bank account in Texas, or borrowed any money in Texas. It does no advertising in Texas. It had a "static website" at www.nfproppants.com.

Alston testified in a deposition that NFP II intended to open an office in Houston but it "just never got there." When questioned about a draft contract that listed NFP II's notice address as 440 Benmar Drive in Houston, Texas, he acknowledged that he wanted the oil and gas industry to believe he had a presence in Houston.

Additionally, NFP II's vice president of sales and marketing James Scott Hohensee testified in deposition that he (i) understood that NFP II's principal office was in Amite, Louisiana, (ii) worked out of his house in Houston, and (iii) did not know of and had never been to a business location at 440 Benmar Drive in Houston, Texas. Hohensee also testified that NFP II's CFO, Brian Mora, was in New Orleans, and its COO, Dan Koxlien, was in Wisconsin.

### (2). Plaintiffs' Evidence

Plaintiffs filed voluminous evidence opposing defendants' special appearances. We discuss the relevant such evidence below.

Plaintiffs first argue that NFP II's second amended company agreement, dated April 8, 2014, shows significant Texas connections. Specifically, that agreement (i) contains a consent to jurisdiction clause selecting Harris County, Texas, as a permissible venue for any action arising from or relating to the agreement; (ii) shows four of the five original members as having

Houston, Texas addresses; (iii) lists 440 Benmar, Suite #3051, Houston, Texas, as NFP II's address for notice purposes; and (iv) defines "business day" with reference to days on which commercial banks are open in Houston, Texas.

Next, plaintiffs argue that NFP II held itself out to the public as being headquartered in Houston, Texas. Not all the evidence plaintiffs cite, however, supports that premise:

- Plaintiffs contend that NFP II's website once said that its headquarters were located at 440 Benmar, Suite 3051, in Houston, Texas, and that this was changed to Amite, Louisiana after NFP II specially appeared. Plaintiffs cite Alston's deposition in support, but Alston's testimony was not so clear. He said that the Benmar, Houston address was "put on the NF Proppants [w]eb site at some time" and that he was aware of it. He further said that he did not remember when the address was taken off and did not know why it was taken off, but as NFP II's CEO and president, it would have been up to him to approve changing the website. The evidence supports an inference that the NFP II website showed a Houston address at one time, but we see no evidence that the website indicated that the Houston address was NFP II's headquarters.

- Plaintiffs argue that NFP II's webpage on LinkedIn.com reflected that its headquarters were in Houston, Texas. For support they rely on the affidavit of Linda LaRue. LaRue said that a copy of "Northern Frac Proppants, LLC's LinkedIn page" was attached, but no copy is attached in the clerk's record. LaRue also said, "Pursuant to Northern Frac Proppants, LLC's own LinkedIn page, it[s] headquarters is Houston Texas." But NFP II is "Northern Frac Proppants, II, LLC," not "Northern Frac Proppants, LLC." Northern Frac Proppants, LLC is NFP I—one of the plaintiffs in this case. LaRue's affidavit is no evidence that NFP II's headquarters is or was in Houston.

- Next plaintiffs rely on three press releases. The first two precede NFP II's formation and appear to concern NFP I. But the third is dated December 24, 2013, and it specifically refers to NFP II. It also indicates that NFP II is "headquartered in Houston." In his deposition, Alston acknowledged that this press release represented to the world that NFP II was headquartered in Houston. He also said that he was "sure" that, as NFP II's president and CEO, he had the opportunity to review the press release before it went out, and he made no changes to it. A fourth press release, dated February 3, 2014, also says that NFP II is "headquartered in Houston" and had a new Wisconsin facility that was "able to efficiently reach the Texas and Oklahoma markets."

- Finally, plaintiffs rely on an online article in *BreakBulk* and a press release on emi-magazine.com. We cannot find these items in the clerk's record,

–33–

although a quotation plaintiffs offer as being from the *BreakBulk* article appears in the February 3, 2014 press release described above.

Thus, NFP II's representations to the public appear to amount to two press releases about NFP II's activities saying that NFP II was "headquartered in Houston."

Plaintiffs argue that NFP II often referenced Houston, Texas, in its contracts and correspondence with others. In support, they refer to the following evidence:

- They contend that Eugene Noonan's deposition shows that (i) his employment agreement with *NFP II* repeatedly referred to Houston, Texas, and (ii) he was given a company agreement stating that the company's principal place of business was in Houston, Texas. But these documents actually refer to *NFP I*,—not *NFP II*—so the record does not support plaintiffs' argument.[7]

- James Scott Hohensee was NFP II's vice president of sales and marketing. Hohensee's employment agreement with NFP II (i) provided that all notices would be sent to NFP II at the Benmar address in Houston, (ii) contained a Texas choice of law clause, and (iii) required disputes relating to the agreement to be arbitrated in Houston, Texas.

- NFP II had a master supply agreement with Schlumberger Technology Corporation that (i) recited that NFP II had a place of business on Benmar in Houston, Texas, and (ii) contained a Texas choice of law clause. It had a similar sand purchase agreement with EOG Resources, Inc. that (i) recited NFP II's address for notice purposes as being on Benmar in Houston, Texas, and (ii) contained a Texas choice of law clause.

- NFP II's credit and guaranty agreement with Deutsche Bank AG provided that NFP II's address for notices was the Benmar address in Houston, Texas. The same address was given for three guarantors. Related UCC financing statements also gave NFP II's mailing address as the Benmar address in Houston, Texas.

- Plaintiffs cite correspondence with government agencies about Wisconsin mining permits, arguing that the correspondence shows NFP II using the Houston, Texas address in those communications. But we have reviewed the record, and we see no references to NFP II in that correspondence.

---

[7] The Alston defendants' fourth issue argues that the trial court should have sustained objections to these documents, but we conclude that the documents are irrelevant in any event.

Plaintiffs also refer us to evidence of other NFP II Texas contacts. These contacts included (i) hiring of Texas professionals, (ii) selling of products to Texas companies, and (iii) referencing a Houston office on Benmar Drive:

- Plaintiffs contend that NFP II hired Baker Botts's Houston office to "create" NFP II, assist with drafting employment agreements, and represent NFP II in completing the Deutsche Bank financing. But NFP II could not hire a law firm to create itself; the evidence instead suggests that Alston and Koxlien may have created NFP II based on Baker Botts's advice. And the trial court struck the evidence about the drafting of employment agreements and the completion of the Deutsche Bank financing.

- The record contains four invoices from Trinity Consultants, Inc. (headquartered in Dallas, Texas) to Northern Frac Proppants LLC located at "440 Brenmar Drive" in Houston, Texas. The invoices refer to "WI dry sand plant permitting." (Alston's affidavit acknowledges that NFP II hired Trinity Consultants to assist with permitting issues in Wisconsin, but it says that Trinity Consultants is a Minnesota company.)

- The record contains a March 2014 report from PropTester, Inc. in Cypress, Texas, to Jeff Alston. The report indicates that PropTester tested a sand sample from "Northern Frac Proppants." Given that NFP II had been formed several months before this report was generated, it is reasonable to infer that this report was actually generated for NFP II.

- Plaintiffs argue that Windward Capital attended various meetings at NFP II's Houston address while it was pursuing financing for NFP II, and that customer meetings were held at the Houston office. The record pages cited for these facts do not actually support them. Rather, Raymond Rhone, who was affiliated with Windward Capital, testified in deposition that he recalled testifying previously that he attended several meetings with potential customers or investors "in Texas," not specifically at the NFP II office. He also testified that he remembered one meeting at Alston's Houston office at 440 Benmar during 2013, but he gave no other details.

- Plaintiffs also filed the affidavit of a process server who attempted to serve this lawsuit on the Alston defendants at the Benmar address in Houston. The office was locked on the three occasions the process server went there, but on one occasion he slid a note with his telephone number under the door, and he got a call from Alston the next day.

- Alston testified in deposition that 60% of NFP II's total production was sold to two companies located in Texas, those being EOG and Schlumberger. Hohensee estimated that those companies actually accounted for 80% of NFP II's sand. And there was other evidence that a

Houston-headquartered company called CARBO received at least one invoice from NFP II.

- Rhone testified at a hearing in another case that "the company is based in Houston," and from the context it can be inferred that he was speaking about NFP II. But he also testified that "[t]he main operation for the company is in Jackson County, Wisconsin, and the facility—the aforementioned Goose Landing Sand facility is in a town called Alma Center[, Wisconsin]."

### b. Application of the Law to the Facts

The ultimate question is whether NFP II is essentially "at home" in Texas the way a domestic company is. NFP II is not incorporated in Texas, so the question becomes whether NFP II's principal place of business is in Texas or whether the facts show an exceptional case for treating NFP II as being at home in Texas. *See Daimler AG*, 134 S. Ct. at 760–61 & n.19. The defendant has the burden of proof, so we must determine whether NFP II conclusively established that it is not at home in Texas or, alternatively, whether the trial court's contrary determination was against the great weight and preponderance of the evidence. *See Lensing*, 417 S.W.3d at 155 (we review implied findings for legal and factual sufficiency of the evidence).

The evidence supports implied findings that NFP II had some Texas contacts before it sold its assets to Badger. Plaintiffs' evidence supports the following implied fact findings:

- NFP II's contracts generally used the Houston address 440 Benmar as its notice address. Some of NFP II's contracts contained Texas choice of law clauses or selected Texas as a forum for disputes. NFP II also used the Houston address on its website.

- NFP II had access to an office at 440 Benmar in Houston and had at least one meeting there.

- NFP II hired Texas companies to do work for it on at least a few occasions.

- NFP II sold most of its sand—60 to 80%—to Texas companies.

- NFP II hired a sales and marketing executive who lived in Texas.

- And, perhaps most importantly, Rhone, who was associated with Windward Capital (an NFP II member), once testified that NFP II was

–36–

"based in Houston," and in at least two press releases NFP II said that it was "headquartered in Houston."

On the other hand, NFP II filed uncontroverted evidence that (i) only one of its roughly 30 employees was in Texas, (ii) its high-level officers directed, controlled, and coordinated its activities in Amite City, Louisiana, (iii) its only product was Wisconsin frac sand, and (iv) its customers took possession and ownership of the sand in Wisconsin. NFP II also filed evidence that it never had "an actual office in Texas," although this evidence was contradicted by the press releases and was also somewhat contradicted by the evidence that NFP II at least had access to a Houston office and used a Houston address in some of its business dealings.

We discount most of the contacts plaintiffs rely on. Purchasing goods and services from a forum count little towards general jurisdiction. *See, e.g.*, *PHC-Minden*, 235 S.W.3d at 171. Neither do sales to forum residents, especially when, as in this case, those sales are structured to occur outside of Texas. *See Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 808 (Tex. 2002); *see also Reyes v. Marine Drilling Cos., Inc.*, 944 S.W.2d 401, 403, 405 (Tex. App.—Houston [14th Dist.] 1997, no writ) (sales of about $850,000 of scrap metal to Texas companies, delivered in Mississippi, did not support general jurisdiction).

The only evidence about NFP II's website is Alston's statement that it was a "static website." Passive websites carry little significance in a general jurisdiction analysis. *See Reiff v. Roy*, 115 S.W.3d 700, 705–06 (Tex. App.—Dallas 2003, pet. denied) (concluding that even a somewhat interactive website did not support general jurisdiction).

Using a Texas address as a notice address in contracts, and occasionally using Texas choice of law clauses and forum selection clauses in contracts does not make a corporation "at home" in Texas the way a domestic business would be. Thus, these acts do not subject NFP II to general jurisdiction in Texas.

Even before the Supreme Court embraced the "at home" standard, at least one Texas court held that having a limited-purpose office in the forum state is not enough to subject the nonresident to general jurisdiction there.  *Alenia Spazio, S.p.A. v. Reid*, 130 S.W.3d 201, 217–18 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).  We conclude that this rule is correct under the "at home" standard.

Here, the evidence shows only that NFP II had access to an office in Houston, Texas, and not that it was used for conducting substantial business, much less that the office was comparable to a principal place of business.  That evidence, without more, does not show that general jurisdiction is proper.

We also conclude that having one sales executive in Texas does not rise to the level of making NFP II "at home" in Texas.  *See BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1559–60 (2017) (Montana lacked general jurisdiction even though defendant had over 2,000 miles of railroad track and over 2,000 employees in Montana); *PHC-Minden*, 235 S.W.3d at 171 (nonresident's ongoing contract for teleradiology services performed by doctors located in Texas was not sufficient contact for general jurisdiction); *Bautista v. Trinidad Drilling Ltd.*, 484 S.W.3d 491, 502–03 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (rejecting general jurisdiction even though defendant had an employee in Texas).

This leaves the question of whether the press releases referring to NFP II as "headquartered in Houston" and an NFP II member's testimony in court that NFP II was "based in Houston" suffice to support a conclusion that NFP II really was "at home" in Texas.  We conclude that the answer is no.  There is no evidence of any concrete facts that would support the truth of these assertions.  The evidence was uncontroverted that none of NFP II's officers lived or officed in Texas.  Of NFP II's roughly 30 employees, most worked at the sand plant in Wisconsin, and its officers are located in Louisiana.  NFP II's sole Texas employee worked out

of his house and was unaware of NFP II's purported Houston office. Although NFP II's press releases show that it held itself out as being headquartered in Houston, all evidence of the actual facts of NFP II's operation is to the contrary. Moreover, the NFP II member's statement that NFP II was "based in Houston" was conclusory and unsupported by any facts. *See Rogers v. TexWest, L.L.C.*, 261 S.W.3d 818, 823 (Tex. App.—Dallas 2008, no pet.) (conclusory special appearance affidavit was not probative evidence).

Accepting as true NFP II's affidavit evidence to the extent it is clear, direct, positive, and undisputed, *see Nacho Remodeling Co.*, 2014 WL 3828219, at \*4, we conclude that NFP II demonstrated as a matter of law that it does not have such substantial contacts with Texas as to make it "at home" here. Because what the record reflects about NFP II's Texas contacts would be typical of every foreign entity with its principal place of business outside the forum state but which transacts business in the forum state, and given the "at home" standard, we conclude as a matter of law that such contacts do not satisfy to establish Texas's ability to assert general jurisdiction over NFP II in this case.

Accordingly, for all of the reasons stated in this section, we hold that Texas lacks general personal jurisdiction over NFP II. We thus need not discuss the fair play and substantial justice prong of the due process test. *See O'Daire*, 2017 WL 930036, at \*4.

### c. Conclusion

For the foregoing reasons, we sustain the Alston defendants' third issue and conclude that the trial court erred by denying NFP II's special appearance.

### IV. BADGER'S APPEAL

Defendant Badger Mining Corporation filed a separate notice of appeal and separate appellant's brief challenging the denial of its special appearance. It asserts three appellate issues.

The first challenges general jurisdiction. The other two challenge specific jurisdiction. We sustain Badger's issues.

## A. Relevant Facts

### 1. Allegations

Plaintiffs asserts five claims against Badger: (i) statutory trade secret misappropriation, (ii) common law trade secret misappropriation, (iii) conversion, (iv) fraudulent transfer, and (v) conspiracy. As explained in Part I.B *supra*, plaintiffs allege that the other defendants stole plaintiffs' assets, moved them into NFP II, and sold them to Badger at far less than fair market value.

Plaintiffs allege that Badger is a Wisconsin corporation that does business in Texas and maintains an agent for service of process in Texas. They allege the following facts to support general jurisdiction:

- Badger has been registered to do business in Texas since 1984.

- About 15% of Badger's sand production is sold in Texas.

- Badger maintains 25 business locations in Canada and the United States. Of these, it owns seven and contracts for the use of the rest. Six of the Badger-owned facilities are in Wisconsin and one is in Texas.

- Badger has one vice president in Washington, D.C., and the rest of its employees are in Wisconsin and Texas. Its entire sales force, except for the vice president in Washington, is in Texas.

- Badger appeared and defended itself in a silicosis lawsuit in Texas that commenced in 2003. Badger did not contest personal jurisdiction in that case.

As for specific jurisdiction, plaintiffs make much the same allegations against Badger as against the Alston defendants:

- Badger stole assets (such as leases, options, other real estate interests, contracts with Texas buyers, trade secrets, and other intellectual property) from Texas companies, thereby committing torts directly aimed at Texas companies and directly affecting Texas commerce and business.

–40–

- Badger participated in a fraudulent transfer by buying the assets with knowledge of this lawsuit and plaintiffs' claims. It paid a fraction of the assets' fair market value.

- The assets' seller, NFP II, was a Texas company with its principal place of business in Texas.

## 2. Badger's Evidence

Badger relied in part on an affidavit by its CEO, Michael Hess, who swore that:

- Badger is incorporated in Wisconsin, and its headquarters and principal place of business are in Berlin, Wisconsin.

- Badger's entire business is processing, cleaning, shipping, distributing, and selling sand. All the sand it uses is mined and processed in Wisconsin.

- Badger has 365 employees, of whom 352 live and work in Wisconsin. All of Badger's board members, executives, and officers are located in Wisconsin. All board meetings are held in Wisconsin. No major corporate decision can be made without approval from Badger's principal Wisconsin office.

- Badger employs 11 salesmen, three of whom live in Texas. The head salesman lives in Washington, D.C. However, plaintiffs filed an excerpt from Hess's deposition in which he seemed to agree that Badger's sales force consisted of six people, three of whom were in Texas.

- "Texas constitutes approximately 15% of Badger's sales of sand."

- Badger owns and operates a transload facility in George West, Texas. It has nine employees there. The highest ranking employee there has no authority beyond the facility's day to day operation. Badger uses similar transload facilities through contracts in North Dakota, Kansas, Oklahoma, Wyoming, Louisiana, New Mexico, and Alberta.

- Badger maintains an agent for service of process in Texas because Texas law requires it.

- None of the meetings between Badger and NFP II about the purchase of NFP II's assets occurred in Texas. Those meetings instead took place in New Orleans; Eau Claire, Wisconsin; and Appleton, Wisconsin. Badger signed the asset purchase agreement in Wisconsin.

- All real property Badger bought from NFP II was "Wisconsin real property." All personal property Badger bought from NFP II was "Wisconsin personal property." Badger paid for the assets from a bank account located in Wisconsin, and the funds were sent to bank accounts in Louisiana and Maryland.

- The only use Badger has made of the purchased assets has occurred in Wisconsin.

- Badger already had longstanding business relationships with EOG and Schlumberger at the time of the purchase.

The asset purchase agreement included a schedule listing "Excluded Assets" as follows:

| Schedule 2.2 - Excluded Assets |
| --- |
| All Assets outside of Wisconsin except any grid stack or related equipment which may be in transit |
| Jefferies Alston's Computer, Software, & peripherals |
| Rebecca Alston's Computer, Software, & peripherals |
| Brian Mora's Computer, Software, & peripherals |
| Office Space outside of Wisconsin |

Thus, the agreement purports to exclude almost all assets located outside Wisconsin, and the non-excluded assets outside Wisconsin appear to have no particular relationship with Texas.

**B.    Badger's First Issue:  Did Badger conclusively negate general jurisdiction minimum contacts?**

Badger's first issue addresses general jurisdiction.  Employing a factual and evidentiary analysis, we conclude that Badger conclusively negated the existence of general jurisdiction minimum contacts.

Badger's affidavit evidence establishes that Wisconsin is where (i) Badger is incorporated, (ii) Badger has its principal place of business, and (iii) where Badger's officers and directors make all major corporate decisions.  Therefore, the question is whether this is an exceptional case in which Badger is nevertheless also "at home" in Texas, like the Philippines corporation that temporarily relocated to Ohio during World War II in the *Perkins* case.  *See BNSF Ry. Co.*, 137 S. Ct. at 1558.  The answer is no.

We have already noted that maintaining a Texas agent for service of process does not subject a nonresident to general jurisdiction here. *See Asshauer*, 228 S.W.3d at 933. Nor does maintaining an employee here. *See PHC-Minden*, 235 S.W.3d at 171; *Bautista*, 484 S.W.3d at 502–03. We further conclude that maintaining in Texas a small number of relatively low-level employees, out of a much larger workforce, also does not make a nonresident corporation "at home" here. *See BNSF Ry. Co.*, 137 S. Ct. at 1559–60 (Montana lacked general jurisdiction even though defendant had over 2,000 miles of railroad track and over 2,000 employees in Montana); *Daimler AG*, 134 S. Ct. 762 at n.20 (general jurisdiction "calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide").

Additionally, that Badger sells about 15% of its production in Texas does not show that it is "at home" in Texas. *See id.*; *see also Reyes*, 944 S.W.2d at 403, 405. Nor does Badger's ownership of one plant in Texas show that it is "at home" here. *See Booth v. Kontomitras*, 485 S.W.3d 461, 480 (Tex. App.—Beaumont 2016, no pet.) ("[A] defendant's ownership of property in a forum state is insufficient for the exercise of personal jurisdiction . . . unless ownership of the real property is the subject of the underlying suit or relates to the underlying cause of action.").

Furthermore, the alleged fact that Badger did not contest personal jurisdiction when sued in Texas in 2003, even if true, does not show that Badger is "at home" in Texas under the *Daimler AG* test. Such a fact says nothing about whether Badger's Texas contacts are so strong as to be comparable to having Texas as Badger's state of incorporation or its principal place of business. *See Daimler AG*, 134 S. Ct. 761 at n.19; *cf. Sembcorp Marine Ltd. v. Carnes*, No. 09-15-00430-CV, 2016 WL 3019552, at *4 (Tex. App.—Beaumont May 26, 2016, no pet.) (mem. op.) (nonresident's decision not to challenge personal jurisdiction in different Texas case was irrelevant to specific jurisdiction).

As with NFP II, Badger's Texas contacts with Texas are typical of foreign entities with out of state principal places of business but who do business in Texas. Sustaining general jurisdiction on these facts is not compatible with Supreme Court's "at home" standard and general jurisdiction precedents since *Perkins*. Accordingly, we sustain Badger's first issue.

**C.     Badger's Second and Third Issues: Did Badger negate specific jurisdiction minimum contacts?**

Badger separates its specific jurisdiction challenge into two issues, one addressing fraudulent transfer and conversion and the other addressing trade secrets misappropriation. Badger also addresses conspiracy within the argument under its fraudulent transfer and conversion issue. *See Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162 (Tex. 2012) (appellate court should address appellant's arguments even if not separately presented as issues). We address the issues together.

As described above, Badger has some purposeful contacts with Texas. Specifically, it (i) owns one facility in Texas, (ii) maintains a few employees in Texas, (iii) has a registered agent for service of process in Texas, and (iv) sells about 15% of its sand to Texas consumers. But specific jurisdiction's relatedness prong requires a substantial connection between the defendant's Texas contacts and the litigation's operative facts. *See Moki Mac*, 221 S.W.3d at 585. "The operative facts are those on which the trial will focus to prove the liability of the defendant who is challenging jurisdiction." *Kaye/Bassman Int'l Corp. v. Dhanuka*, 418 S.W.3d 352, 357 (Tex. App.—Dallas 2013, no pet.). Badger's Texas contacts will not be the focus of any trial of trade secret misappropriation, conversion, fraudulent transfer, or conspiracy claims against Badger. Such a trial will focus on the dealings between Badger and the Alston defendants, which took place entirely outside Texas. Thus, this case is unlike *Moncrief*, in which the defendants allegedly received trade secrets during a meeting in Texas. *See* 414 S.W.3d at 153.

Nonetheless, plaintiffs rely on *Dontos v. Vendomation NZ Ltd.*, 582 F. App'x 338 (5th Cir. 2014), to support their argument. In that case, Texas resident plaintiffs were franchisees of a failed company whose assets, including five Texas franchise agreements, were transferred several times before reaching some nonresident companies collectively called Vendomation.

The plaintiffs sued Vendomation in Texas federal court for fraudulent transfer, and Vendomation contested personal jurisdiction. The district court held for the defendants, but the Fifth Circuit reversed, holding that (i) Vendomation's five Texas franchise agreements amounted to minimum contacts with Texas and (ii) the plaintiffs' fraudulent transfer claims against Vendomation were closely related to those contacts. *Id*. at 347. The court analogized to the Texas Supreme Court's *Retamco* opinion, which held that a nonresident who acquired Texas real estate was subject to specific jurisdiction in Texas for a fraudulent transfer claim about that real estate. *See id*. (citing *Retamco*, 278 S.W.3d at 341).

*Dontos*, however, is distinguishable from the case at bar. Specifically the *Dontos* defendants established a substantial connection with Texas by accepting five Texas franchise agreements that were closely related to the plaintiffs' claims. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479–80 (1985) (franchise agreement created substantial connection between franchisee and home state of franchisor). But here, Badger's acquisition of the assets of a sand mining business that owned a single operating sand mine in Wisconsin—and no mines in Texas—did not create a substantial connection with Texas, nor did it invoke the benefits and protections of Texas law so as to indicate purposeful availment related to this case. *See Michiana*, 168 S.W.3d at 785; *see also Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 582–84 (Tex. App.—Austin 2006, no pet.) (no personal jurisdiction over Texan's fraudulent transfer claims based on transfers of cash outside of Texas).

Although the asset purchase agreement in the present case provided for the assignment of several contracts, including those with EOG and Schlumberger, this fact gives the transaction as a whole only a slight and attenuated connection to Texas. *See Moki Mac*, 221 S.W.3d at 577 (jurisdiction absent if contact creates only an attenuated affiliation with the forum state); *see also M&F Worldwide Corp. v. Pepsi-Cola Metro. Bottling Co., Inc.*, No. 15-0083, 2017 WL 889938, at *7 (Tex. Mar. 3, 2017) (no specific jurisdiction over claims arising from transaction that occurred outside Texas, even if transaction parties did preliminary planning and negotiating in Texas).

We sustain Badger's second issue without reaching the fair play and substantial justice prong.

**D.     Conclusion**

Having sustained Badger's issues, we hold that the trial court erred by denying Badger's special appearance.

## V.  PLAINTIFFS' APPEAL

**A.     Plaintiffs' Sole Issue:   Did the trial court err by concluding that it lacked jurisdiction over the Tesson defendants?**

Relying on both general and specific jurisdiction theories, plaintiffs appeal from the trial court's orders granting Patrick Tesson's and J&P's special appearances.  We refer to these appellees as the "Tesson defendants."  Based on the relevant evidence, we conclude that the trial court did not err.

### 1. General Jurisdiction

#### a. Tesson

The verification of Tesson's special appearance stated that he is a Florida resident.[8] He also filed an affidavit in which he stated that: His home address is in Florida. He is a member and co-CEO of NFP II. He has traveled to Texas on NFP II's behalf once, to testify in Houston in a lawsuit by Windward Capital arising from the asset sale to Badger. He performed no work in Texas to secure funding for NFP II, nor did he secure any funding for NFP II from any Texas resident. In the last ten years, Tesson has not (i) owned or rented real property in Texas, (ii) had a Texas bank account, (iii) borrowed money from a Texan, or (iv) recruited or hired a Texan.

Tesson also filed excerpts from his deposition showing that:

- He once lived in Texas for between eight and nine years. That ended 27 years ago.

- He is employed by TNT Crane & Rigging, which has an office in Houston. During the five years leading up to his deposition, Tesson came to Texas about ten to fifteen times for meetings concerning that business, and he manages its Louisiana operations.

- He once owned some farmland and a house in Texas, but he sold them about 26 years ago.

- He is the president and director of a Texas company called Comspec, Inc. It operated for about four years in the mid-1980s and hasn't operated in the last 15 or 20 years. He keeps its legal status for insurance purposes.

- He is the president of another Texas company called Construction Specialists. He also keeps its legal status for insurance purposes.

- He had a company in Texas called Tesson Management Services, Inc. in 1982.

- He owned a Louisiana crane business that merged with TNT Crane.

---

[8] Plaintiffs' live pleading alleges that Tesson is "currently residing" in Louisiana, so even plaintiffs do not claim that Tesson is a Texas resident.

Plaintiffs add that Tesson did not object to personal jurisdiction in two Houston lawsuits arising from the asset sale to Badger and that he hired Texas counsel to represent him in at least one of the Houston actions.

For our general jurisdiction analysis, we consider Tesson's Texas contacts extending back a reasonable number of years and continuing until when suit was filed. *See PHC-Minden*, 235 S.W.3d at 170. In that vein, we conclude that Tesson's Texas contacts ending more than 20 years before this suit was filed, such as his Texas residency and his ownership of Texas real estate, are stale for jurisdictional purposes.

Moreover, Tesson's remaining contacts do not suffice because they do not show that he is comparable to a Texas domiciliary. He works for a Texas company and occasionally comes to Texas for work-related meetings. He is the president of two dormant Texas companies that he maintains in good standing for insurance purposes. Although Tesson is a member and co-CEO of NFP II, we have already concluded that NFP II itself is not subject to personal jurisdiction in Texas. Tesson's involvement in the Houston lawsuits is not particularly weighty in deciding the general jurisdiction question. *See Johns Hopkins Univ. v. Nath*, 238 S.W.3d 492, 501 (Tex. App.—Houston [14th Dist.] 2007, pet. denied). Accordingly, Tesson's Texas contacts do not make him "at home" in Texas such that he should be subject to suit here for any cause of action arising anywhere in the world. *See PHC-Minden*, 235 S.W.3d at 168–69 (general jurisdiction is "dispute blind").

Nonetheless, plaintiffs urge that the NFP II company agreement has a Texas consent to jurisdiction clause that weighs in favor of Texas's having general jurisdiction over NFP II's members. But the clause is not a waiver of personal jurisdiction defenses as to any and all claims. Instead, the clause applies to only an action or proceeding arising out of or relating to that agreement. We find no authority that a consent to jurisdiction clause applicable to a specific

set of claims permits the exercise of general jurisdiction over the contracting parties for claims not within the clause. Some authority, however, supports the opposite result. *See Valero Mktg. & Supply Co. v. Gen. Energy Corp.*, 702 F. Supp. 2d 706, 712–13, 717 (S.D. Tex. 2010); *Guam Indus. Servs., Inc. v. Dresser-Rand Co.*, No. 01-15-00842-CV, 2017 WL 219157, at \*5–6 (Tex. App.—Houston [1st Dist.] Jan. 19, 2017, no pet.). Therefore, the inapplicable consent to jurisdiction clause in the NFP II agreement does not make Tesson susceptible to general jurisdiction in Texas, nor is it a weighty contact that otherwise makes him "at home" here.

Accordingly, the trial court did not err by concluding that Tesson is not subject to general jurisdiction in Texas.

### b. J&P Capital, LLC

J&P filed a Tesson affidavit reciting that: (i) J&P is a Delaware limited liability company with its sole office and principal place of business in Amite City, Louisiana; (ii) Tesson is J&P's manager, and J&P has two members: Alston and Tesson Family Holdings, LLC; (iii) J&P became an NFP II member; (iv) J&P has never had any offices or employees in Texas; (v) J&P has not recruited or hired any Texas residents; (vi) J&P has never had any subsidiaries located in Texas (vii) it has not owned or rented Texas real property; (viii) it does not advertise or seek customers in Texas; (ix) it has never had any Texas bank accounts or borrowed money from a bank or person in Texas; and (x) it has never done business in Texas and does not maintain a registered agent for service in Texas.

Tesson also testified by deposition that (i) J&P has no employees and (ii) that J&P was actively seeking other investments but it was not seeking investors or looking at investments in Texas.

–49–

Furthermore, in a Houston lawsuit arising from the asset sale to Badger, Tesson testified at a preliminary injunction hearing that J&P acquired its interest in NFP II by buying "preferred stock" for $5 million.

Moreover, the NFP II limited liability company agreement has a consent to jurisdiction clause whereby its members consented to jurisdiction and venue in Harris County, Texas for cases arising out of or relating to that agreement. Similarly, the subscription agreement whereby J&P bought its interest in NFP II provided that (i) the closing would occur at Baker Botts's Houston office unless otherwise agreed by the parties, (ii) Delaware corporate law would govern issues regarding the company and its unitholders' relative rights, but Texas law would govern other questions about the agreement's construction, validity, and interpretation, and (iii) notices would be sent to NFP II at the Benmar address in Houston, but notices to J&P would be sent to an address in New Orleans, Louisiana.

Plaintiffs also argue that J&P defended the Houston actions arising from the asset sale to Badger without contesting jurisdiction and hired Texas counsel to represent it in at least one of the Houston actions.

But, taking J&P's evidence as true and considering the other facts that plaintiffs argue, we nonetheless conclude that J&P is not subject to general jurisdiction in Texas. J&P's chief contact with Texas is its investment in NFP II, which we have already held is not subject to personal jurisdiction in Texas. J&P's other Texas contacts, such as the limited and inapplicable consent to jurisdiction clause in the NFP II company agreement and its participation in Houston litigation, do not make it "at home" in Texas. Therefore, the trial court did not err by concluding that J&P was not "at home" in Texas so as to be subject to general jurisdiction here.

## 2. Specific Jurisdiction

Plaintiffs' specific jurisdiction theory against the Tesson defendants is the same as their specific jurisdiction theory against the Alston defendants: the Tesson defendants helped steal the assets of Texas companies and sell them to Badger in a fraudulent transfer. We have already concluded, despite similar arguments, that the Alston defendants are not subject to specific jurisdiction as to any of plaintiffs' claims. We reach the same result as to the Tesson defendants, adding the following analysis to address plaintiffs' additional arguments against the Tesson defendants.

Plaintiffs argue that the Tesson defendants used NFP II to commit intentional torts against plaintiffs and that NFP II's Texas contacts are therefore attributable to the Tesson defendants for personal jurisdiction purposes. We reject this argument for several reasons.

First, plaintiffs did not plead alter ego or another veil-piercing theory against the Tesson defendants.

Second, we have already concluded that NFP II itself is not subject to personal jurisdiction in Texas. *See* Part III.C *supra*. So, even if NFP II's Texas contacts could be imputed to the Tesson defendants, that would not establish personal jurisdiction over the Tesson defendants.

Finally, plaintiffs rely on *Calder v. Jones*, 465 U.S. 783 (1984), and a number of cases from other jurisdictions applying *Calder*, particularly the *Vizant Technologies* case we have already discussed above. *See* Part III.A.3.b(1) *supra*. The gist of plaintiffs' argument is that a defendant purposefully avails itself of a forum state if it engages in extra-forum conduct knowing that persons in the forum state will bear the brunt of that conduct's effects. But the question is not whether the defendant knows its conduct will cause effects felt by forum residents; it is whether the defendant sought benefit, advantage, or profit by availing itself of the forum state.

*See Michiana*, 168 S.W.3d at 785, 788–89; *see also Kelly*, 301 S.W.3d at 660. Here, the Tesson defendants have shown that they did not avail themselves of Texas.

For these reasons, we conclude that the trial court did not err by concluding that the Tesson defendants proved that they did not have specific jurisdiction minimum contacts with Texas.

## B.     Conclusion

Plaintiffs have not shown that the trial court erred by implicitly concluding that the Tesson defendants lacked minimum contacts with Texas. Accordingly, we need not address whether the exercise of personal jurisdiction over them would offend traditional notions of fair play and substantial justice. *See O'Daire*, 2017 WL 930036, at *4. We overrule plaintiffs' sole appellate issue.

## VI.  DISPOSITION

For the foregoing reasons, we (i) reverse the trial court's orders denying the special appearances by defendants Northern Frac Proppants, II, LLC, Lamstex Material Handling, LLC, Jeffries Alston, and Badger Mining Corporation; and (ii) we affirm the trial court's orders granting the special appearances by defendants J&P Capital, LLC and Patrick A. Tesson. Accordingly, we render judgment dismissing this case for lack of personal jurisdiction.

/Bill Whitehill/

BILL WHITEHILL
JUSTICE

160319F.P05

–52–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

NORTHERN FRAC PROPPANTS, II, LLC, LAMSTEX MATERIAL HANDLING, LLC, AND JEFFRIES ALSTON, Appellants

No. 05-16-00319-CV     V.

2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC, AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellees

and

BADGER MINING CORPORATION, Appellant

V.

2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC, AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellees

and

2011 NF HOLDINGS, LLC F/K/A NF HOLDINGS, LLC, AND NORTHERN FRAC PROPPANTS, LLC, AND ITS SERIES SUBSIDIARIES, Appellants

On Appeal from the 162nd Judicial District Court, Dallas County, Texas
Trial Court Cause No. DC-15-01754.
Opinion delivered by Justice Whitehill.
Justices Lang and Brown participating.

V.

J & P CAPITAL, LLC and PATRICK A.
TESSON, Appellees

       In accordance with this Court's opinion of this date, we **AFFIRM** in part and **REVERSE** in part. We **REVERSE** the trial court's orders denying the special appearances by appellants Northern Frac Proppants, II, LLC, Lamstex Material Handling, LLC, Jeffries Alston, and Badger Mining Corporation. We **AFFIRM** the trial court's orders granting the special appearances by appellees J & P Capital, LLC, and Patrick A. Tesson. We **DISMISS** the case for want of personal jurisdiction.

       It is **ORDERED** that appellants Northern Frac Proppants, II, LLC, Lamstex Material Handling, LLC, Jeffries Alston, and Badger Mining Corporation recover their costs of this appeal from appellees 2011 NF Holdings, LLC f/k/a NF Holdings, LLC, Northern Frac Proppants, LLC, and its series subsidiaries. It is further **ORDERED** that appellees J & P Capital, LLC, and Patrick A. Tesson recover their costs of this appeal from appellants 2011 NF Holdings, LLC f/k/a NF Holdings, LLC, Northern Frac Proppants, LLC, and its series subsidiaries.

Judgment entered July 27, 2017.